IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 18, 2018

**STATE OF TENNESSEE v. MICHAEL A. FLIPPEN, JR.**

**Appeal from the Circuit Court for Montgomery County**
**No. 2015-CR-935    William R. Goodman, III, Judge**

_____

**No. M2017-01288-CCA-R3-CD**

_____

The Defendant, Michael A. Flippen, Jr., entered a guilty plea to second degree murder, with the length of his sentence to be determined by the trial court. Following a hearing, the Defendant received a twenty-year sentence to be served in the Tennessee Department of Correction. On appeal, the Defendant challenges the length of his sentence, arguing that the trial court abused its discretion in applying certain enhancement factors. After review of the record and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Gregory Smith, Clarksville, Tennessee (on appeal); Sheri S. Phillips and Sharon T. Massey, Clarksville, Tennessee (at hearings) for the appellant, Michael A. Flippen, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; John W. Carney, District Attorney General; and Lee Willoughby, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The Defendant shot and killed the victim, Ms. Princess Clark, and was indicted for first degree premeditated murder, being a felon in possession of a firearm, possessing a weapon after being convicted of a domestic violence offense, and reckless endangerment. The Defendant entered a guilty plea to the lesser-included offense of second degree

murder. Pursuant to the plea agreement, the remaining charges were dismissed, and the length of sentence was to be determined by the trial court.

At the guilty plea hearing, the State proffered the factual basis for the plea. At approximately 8:30 p.m. on June 8, 2015, the police responded to a call made by the victim's fourteen-year-old son, who reported that the victim "was on the ground [and] unable to move." Responding officers found the victim lying on the floor in a pool of blood, and she told them that the Defendant had shot her. She had been shot in the back of her shoulder, paralyzing her from her shoulder down. She died as a result of her injuries a few days later. Text messages discovered on the victim's cellular telephone showed that she and the Defendant were in an "on-again-off-again relationship that had turned south." A few days prior to the shooting, they got into an argument, and their relationship was ending. The Defendant sent messages to the victim indicating that he was going to go to her residence. Forty to forty-five minutes prior to the shooting, he sent a message to the victim that said, "knock knock," which indicated he was at her door. A few days after the shooting, the Defendant turned himself in to authorities.

The trial court accepted the Defendant's plea, and a subsequent sentencing hearing was held to determine the length of sentence for the second degree murder conviction.

### State's Proof

At the sentencing hearing, the State entered a presentence report into evidence. The report indicated that the Defendant had multiple prior convictions, including one felony conviction, multiple convictions involving weapons, and one conviction involving domestic violence. The Defendant reported being affiliated with a gang and spending time with gang members. He also reported having been diagnosed with post-traumatic stress disorder and hypertension. The report stated that the victim's fourteen-year-old son was present in the victim's residence when the shooting occurred.

Mr. Willie Clark, Jr., the victim's father, testified about how the loss of his daughter affected his family. He explained that he and his wife were raising the victim's three children, ages ten, twelve, and sixteen. He said that the victim "never caused [him] any problems," that she was "[v]ery quiet" and "mild-mannered," that she never got in trouble in school, that she joined the United States Navy after high school, and that she was never in any criminal or legal trouble. He testified that after the shooting, the victim was hospitalized for three days before she passed away. She was paralyzed but was able to speak. On cross-examination, Mr. Clark testified that he did not know the victim had been dating the Defendant until she was killed. He identified the victim's handwriting on a Valentine's Day greeting card, which was sent to the Defendant while he was incarcerated for another offense prior to the shooting.

Ms. Lucnell Clark, the victim's mother, testified about how the loss of her daughter had affected her, as well as her family. She described the victim as "a beautiful person," explaining that the victim did not hate anybody. She stated that she never had any problems with the victim and that the victim "didn't do nothing to nobody." She said the victim's children asked every day why their mother was gone.

Ms. Latoya Carney, the victim's sister, testified that she received a message from the Defendant a few days before the shooting, which stated, "[Y]ou have a wonderful sister." Ms. Carney said she showed the message to the victim, and the victim instructed her to ignore the message. The victim told Ms. Carney that she had continuously told the Defendant to leave her alone but that the Defendant would not do so. Ms. Carney testified that the victim had never been in "a fight or anything." On cross-examination, Ms. Carney agreed that she did not know the victim and the Defendant had been dating for two years. She stated that she did not know whether the victim and the victim's husband were separated at the time of the shooting and that to the best of her knowledge, the victim's husband was in Texas for a week. She said the victim did not tell her that the victim had picked up the Defendant when he got out of jail. She denied knowing the victim would "hang around people who used drugs," and she was unaware the victim's autopsy showed cocaine in her system.

Mr. Jimmy Clark, the victim's uncle, testified that the victim served in the Navy for five years and that he worked with the victim in the same department at Fort Campbell. He stated that the victim had celebrated her tenth wedding anniversary the day before her death. He testified about the effect the loss of his niece had on his family. He stated that when gun violence occurs, it does not affect one victim but "an entire network, a community of individuals — mothers, children, brothers, acquaintance[s], whose lives are going to be changed forever."

**Defense Proof**

Mr. Michael Flippen, Sr., the Defendant's father, testified that the Defendant graduated from high school with honors and was active in sports. The Defendant was offered a college scholarship but decided to join the United States Air Force, instead. He served three years in the Air Force and completed a tour in Kuwait before being honorably discharged for misconduct. Mr. Flippen believed the Defendant had some incidents of underage drinking. He testified that the Defendant had two children, ages eight and twelve, and described the Defendant's relationship with his children as "very close." He described the Defendant as a "very active" and "very, very good father." He stated that the Defendant seemed "very, very depressed" after his service with the Air Force. He described the Defendant as "very sensitive" and said nothing was going well

for the Defendant. Mr. Flippen met the victim when they were co-workers. He said the victim and the Defendant were in a relationship "off and on … [for] about three to four years." He explained that prior to the shooting, the Defendant was in jail because he was trying to get himself "straight to where when he got out he wouldn't be on any probation."

Mr. Flippen described the Defendant's demeanor before the shooting as "very, very depressed." He said that he knew something was going on with the Defendant but that the Defendant would never give him "a good answer." He described the Defendant as "very, very remorseful [and] very depressed" while incarcerated after the shooting. He said that the Defendant had been in four different jails, that he visited the Defendant at each one, and that he never knew the Defendant to be in any trouble while incarcerated. He believed the Defendant could make something of himself because he was smart and had some college education.

Ms. Dianna Pierce, the Defendant's sister, testified that the Defendant was shy, sensitive, and caring as a child. She stated that she never witnessed the Defendant being aggressive. She testified that the Defendant had been involved with the victim "on and off for like two and a half years." She said that after the Defendant got out of jail, he and the victim planned on living together and getting married. She said the Defendant was incarcerated for traffic violations. She stated that he talked about his children "[a]ll the time" and that he made her promise to take care of them. She said she saw the Defendant walking down the street on June 8, 2015, sometime prior to the shooting. He appeared to be "extremely emotional" and crying. He told her that "he was done with life" and "had nothing else to offer." Ms. Pierce stated that the Defendant supported his children before his incarceration and that he "ha[d] a big influence on [his children]." She had never heard him raise his voice at his children. She believed the Defendant could be rehabilitated.

On cross-examination, Ms. Pierce testified that after the victim picked up the Defendant from jail, "she changed her mind about their relationship." When asked whether she believed the ending of their relationship had anything to do with the fact the victim is no longer alive, she responded, "Currently, yes." On redirect examination, Ms. Pierce said that being with the victim was "the best thing [the Defendant] could have ever wanted" and that he was upset when the victim changed her mind about their relationship.

Sergeant Brian Lee of the Montgomery County Sheriff's Office testified that he was a Disciplinary Classification Officer and knew the Defendant from his time in jail. He stated that the Defendant was not moved to different jails due to disciplinary issues. He testified that the Defendant had no rule violations during his time in jail and that he

- 4 -

had "no problems" with the Defendant. On cross-examination, Sergeant Lee explained that the Defendant had a violation for fighting in 2010; a rule violation in 2014, which Sergeant Lee did not look up; and a violation for a clogged toilet in June 2016. He agreed that the Defendant had been in and out of jail for at least seven years.

Dr. Janie Berryman, a licensed psychologist, testified that she met with the Defendant in October 2016 while he was incarcerated. She spent three to four hours with him and reviewed much of the Defendant's legal file, the coroner's report, the police records, and text messages sent between the Defendant and the victim. During the interview, the Defendant told Dr. Berryman that he had been in a relationship with the victim "on and off" again for approximately three years. According to the Defendant, the victim told him that "she was done with her husband" and "wanted to be with him." He went to jail for driving on a suspended license, and he and the victim planned on moving away once he was released from custody. The victim had "constant contact" with the Defendant during his incarceration. The Defendant told Dr. Berryman that he began hearing rumors that the victim was involved with another person and had been using drugs. The victim picked up the Defendant when he was released from jail, and their relationship continued. When the Defendant saw the victim in public, "she would have nothing to do with him." The situation "escalated" to where the Defendant was kicked out of a nightclub. The Defendant described the text messages between him and the victim as, "[C]ome here, go away. Come here, go away." The Defendant described himself to Dr. Berryman during this time as very upset, distraught, and contemplating suicide. At some point, the Defendant wanted a "final answer" from the victim, so he went to her residence. He told Dr. Berryman that he arrived at her door, that he and the victim argued, and that the victim said, "I may F someone else, but it is not going to be you." The Defendant said that he "blacked out," heard a "pop," realized there was a hole in the victim's door, and "took off." Dr. Berryman testified that the Defendant was remorseful and that he said he did not intend to kill the victim when he went to her residence. The Defendant told Dr. Berryman that he was still very depressed after the shooting. Dr. Berryman described the Defendant as "pretty stoic" and opined that "he was kind of accepting of his circumstances." She believed the Defendant seemed "very forthright" and that what he had told her was consistent with what she heard from other witnesses at the sentencing hearing.

On cross-examination, Dr. Berryman acknowledged that she reviewed text messages sent from the Defendant to the victim, which included threats of injury. She described the messages as "very angry, back and forth." She testified that the Defendant was "on a roller coaster the whole week prior" to the shooting and described him as "up and down, very upset, angry, sad, back and forth." She testified that she considered his actions to be "more of an impulsive, explosive thing as opposed to premeditated." She clarified that she was basing her opinion on what the Defendant reported to her. She

testified that the Defendant took "full accountability" for shooting the victim but that his emotions had "boiled over several days until [they] just exploded into the final scene." When asked about a text message sent from the Defendant to the victim, which said, "You n***** going to be in the same grave together," Dr. Berryman explained that based on what the Defendant told her, she interpreted the message as meaning "you both deserve each other."

The Defendant presented an allocution, expressing his remorse for the victim's death. He explained that they had planned on getting married and starting a new life together. He apologized to the victim's family, his own family, and the community. He expressed his intention to be a positive role model when released into the community. He requested that the victim's family forgive him for his actions.

The trial court considered the presentence report, the testimony presented, and the exhibits entered into evidence. The trial court applied four enhancement factors: (1) that the Defendant had a previous history of criminal convictions or behavior; (3) that the offense involved more than one victim; (9) that the Defendant employed a firearm during the offense; and (10) that the Defendant had no hesitation about committing a crime when the risk to human life was high. *See* T.C.A. 40-35-114(1), (3), (9), (10). In applying enhancement factor (3), the trial court stated:

> It is correct, we really don't know where [the victim's] son was. We did hear the telephone call of [the son] to 911[1] and though he may not have been in the room when the shot was discharged, he did come down and find his mother [ly]ing in the floor.

The trial court noted that there was "no question … that" enhancement factor (10) applied but offered no additional explanation. The trial court applied mitigating factor (2), that the Defendant acted under strong provocation, noting, "There is probably no greater emotional influence on human beings than this drive for love …." *See* T.C.A. § 40-35-113(2). The court also considered, under the catch-all mitigating factor, the fact that the Defendant pled guilty, sparing the victim's family and his family "the heartache and trouble of trial." *See* T.C.A. § 40-35-113(13) ("Any other factor consistent with purposes of this chapter."). The trial court sentenced the Defendant as a Range I, standard offender to a within-range sentence of twenty years. *See* T.C.A. §§ 39-13-210(c) (2014); 40-35-112(a)(1).

## ANALYSIS

---

[1] The trial court referred to a recording of the 911 call admitted into evidence during a prior hearing on the Defendant's motion to suppress portions of the call.

The Defendant argues on appeal that the trial court erred in applying enhancement factor (3), that the offense involved more than one victim, and factor (10), that the Defendant had no hesitation about committing a crime when the risk to human life was high. *See* T.C.A. § 40-35-114(3), (10). The State does not address the application of these factors; instead, it asserts that even if the trial court misapplied the factors, the sentence was not an abuse of discretion because the sentence complied with the purposes and principles of the Sentencing Act.

A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707-08 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. The trial court is "to be guided by – but not bound by – any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Id.* at 706. The "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id.* The appealing party has the burden to show that the sentence was improper. *State v. Cooper*, 336 S.W.3d 522, 525 (Tenn. 2011).

In determining the sentence, the trial court must consider: (1) any evidence received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) the evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b) (2014). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(4), (5).

The Defendant argues that the trial court erred in applying enhancement factor (3), that the offense involved multiple victims, because the victim's son was not a victim. For the purpose of this factor, "victim" has been defined as "a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime." *State v. Raines*, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994); *see also State v. Kelley*, 34 S.W.3d 471, 480 (Tenn. Crim. App. 2000); *State v. Williamson*, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995). This court has specifically excluded from this definition "a person who has lost a loved one or a means of support because the perpetrator of the crime killed a relative." *Id.* Nothing in the record supports a finding that the victim's son was injured, killed, had property stolen, or had property destroyed. The trial court erred in applying this enhancement factor.

The Defendant also argues that the trial court erred in applying enhancement factor (10), that the Defendant had no hesitation when the risk to human life was high. The trial court provided no explanation regarding the basis for this factor. Our supreme court has noted that "the law has been clear for over twenty years that this enhancement factor is applicable only when there is proof that the defendant's conduct in committing the offense created a high risk to the life of someone other than the victim." *State v. Trent*, 533 S.W.3d 282, 294 (Tenn. 2017) (citing cases). Thus, the trial court could not have predicated the application of this enhancement factor on the risk to the victim's own life.

However, the risk to the life of the victim's son may qualify under this factor. The Defendant argues that the victim's son was not nearby when the victim was shot. Although the trial court noted that the exact location of the son was unknown, it is clear from the record that he was present inside the residence at the time of the shooting, that the Defendant shot through the door of the residence, and that the victim was shot from behind. We conclude that the trial court did not abuse its discretion in applying this factor. *See State v. Barry Smith*, No. W2011-02122-CCA-R3-CD, 2013 WL 6388588, at *20, 23, 25 (Tenn. Crim. App. Dec. 5, 2013) (noting that factor (10) was properly applied where defendants fired multiple shots at a residence occupied by more people than just the victims named in the indictment); *State v. Jimmy A. Salyer*, No. 03C01-9803-CR-00093, 1999 WL 812484, at *9 (Tenn. Crim. App. Oct. 8, 1999) (upholding application of factor (10) when the defendant fired shots from the sunroof of his vehicle, exited the vehicle, and continued firing at the victim when neighbors were inside and outside their homes, construction workers were on a nearby roof, and the victim's girlfriend was in a residence nearby); *State v. Thomas Ware*, No. 02C01-9508-CR-000228, 1997 WL 30346, at *8 (Tenn. Crim. App. Jan. 28, 1997) (concluding that factor (10) was properly applied when the defendant fired shots in an area where other vehicles were driving and a store was open to the public for business). *But see Frank J. Beasley v. State*, No. M2013-00489-CCA-R3-PC, 2013 WL 5861797, at *5 (Tenn. Crim. App. Oct. 29, 2013)

(concluding that factor (10) was improperly applied where the defendant fired shots at another vehicle near a neighborhood "because the State did not prove that any other person's life was at risk" other than the named victims).

Nevertheless, even if the trial court misapplied enhancement factor (10) in addition to its misapplication of factor (3), the misapplication of enhancement or mitigating factors is no longer a basis for reversal of a trial court's sentencing decision so long as the sentence is consistent with the purposes and principles of sentencing. *Bise*, 380 S.W.3d at 706. In *State v. Bise*, the evidence did not support the sole enhancement factor applied by the trial court, yet the sentence was still upheld because the trial court considered the pre-sentence report, the defendant's prior convictions, the defendant's amenability to rehabilitation, and the need for deterrence for crimes of such nature. *Id.* at 709. Here, the trial court properly considered the statutory criteria, as well as other facts supported by the record. Moreover, the Defendant concedes that the trial court properly applied enhancement factors (1) and (9), that the Defendant had a previous history of criminal behavior and that the Defendant employed a firearm during the offense. Given the presumption of reasonableness granted to within-range sentences, we conclude that the twenty-year sentence was consistent with the purposes and principles of sentencing. The Defendant is accordingly denied relief.

## CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE